■ In the Matter of DOROTHY ACOSTA et al., Petitioners, v DONALD H. WOLLETT, as Director of the Office of Employee Relations of the State of New York, et al., Respondents.—Proceeding pursuant to CPLR article 78 (transferred to this court by order of the Supreme Court at Special Term, entered in Albany County) to review determinations of the Director of Employee Relations that petitioners violated subdivision 1 of section 210 of the Civil Service Law by engaging in a strike. When fire damaged the

employment building of the petitioners in Bay Shore, New York, the State Unemployment Insurance Department (department) obtained temporary substitute office space in three separate buildings; one at 13 East Main Street, one at 19 East Main Street, formerly a department store called Ben's, and one at 63 Park Avenue. The work of processing unemployment claims and the clerical work related thereto were to be performed at Ben's, and about 25 employees, employment security clerks for the most part, were assigned to Ben's to process the continuing applications; 18 others, mostly claim examiners and other employment security clerks, were assigned to 13 East Main Street; and the third group was assigned to 63 Park Avenue to process new claims. When the group assigned to Ben's complained about the working conditions there shortly after their assignment, they were reassigned to 24 East Main Street (the site of the fire), but the smoke odors and fumes at 24 East Main Street required their reassignment to Ben's on February 2, 1977. The department agreed to do what it could to alleviate the undesirable working conditions at Ben's. CSEA argues herein that a field representative of the department promised to obtain a certificate of occupancy on the following Monday, February 7, 1977, as a precondition to requiring the employees to work at Ben's. This allegation is disputed, the department maintaining that it believed a certificate of occupancy was forthcoming and that new office space was being sought. In any event, at the start of work on Monday morning, February 7, 1977, a certificate of occupancy had not been issued, presumably because the town offices had not opened yet. At 10:45 A.M. it became doubtful that such certificate would be forthcoming. The CSEA representative read a statement instructing the employees to go to lunch and upon their return to "go upstairs" at 13 East Main Street, because Ben's was "unsafe and cold" and lacked a certificate of occupancy and they would not be required to work there. Upon returning from lunch, the employees brought clerical work of their own choosing upstairs to 13 East Main Street. The supervisor in charge received and conveyed information that an alternative office would be provided the next day and ordered the clerks to return to Ben's to process the claimants waiting there. The employees refused and the processing of claims at Ben's had to be suspended until Wednesday, February 9. The supervisor then interviewed the clerks and asked them if they were willing to work. Their response was either "no comment" or that "they were ready, willing and able to work in a safe and healthy environment". In the face of these statements, the supervisor found that the employees were engaged in a strike and imposed sanctions on all who refused to return to Ben's. On appeal the petitioners contend the record does not contain substantial evidence to support respondent's determination that they were engaged in a strike within the meaning of subdivision 9 of section 201 of the Civil Service Law defining "a strike" as "any strike or other concerted stoppage of work or slowdown by public employees". The petitioners contend that they did in fact work at the premises to which they removed themselves by taking available clerical work with them and that their refusal to work at Ben's was prompted by a genuine and well-founded concern for their own safety, inasmuch as the working conditions at Ben's were substandard. Petitioners contend that the building was virtually unheated, requiring them to wear their coats; that the wires from space heaters lying along the concrete floor made walking hazardous; that the electricity was deficient and that the exits were limited; that the boiler was not operating; that one toilet was stopped up; and that the building was dusty and dirty from nonuse. Conceding that the working conditions at Ben's were less than ideal, they

were not so extreme as to justify the petitioners' refusal to work in the place assigned, or on the tasks assigned to them. The refusal of petitioners to work until a certificate of occupancy was issued was unreasonable, and their failure or refusal to obey the supervisor's order to process the claimants who were at Ben's constituted a stoppage or slowdown of work, even though they were engaged in other work of their own choosing *(Matter of Dowling v Bowen,* 53 AD2d 862, mot for lv to app den 40 NY2d 806). Their refusal to perform their duties except on their own terms justified a finding by the respondent, based on substantial evidence, that they had engaged in a strike in violation of subdivision 1 of section 210 of the Civil Service Law, and were liable for the sanctions that were imposed. Determinations confirmed, and petitions dismissed, without costs. Greenblott, J. P., Main and Casey, JJ., concur.

Staley, Jr., and Mikoll, JJ., dissent and vote to annul in the following memorandum by Mikoll, J. Mikoll, J. (dissenting). The facts of this proceeding are largely uncontested. As a result of a fire in a previous office space, some of the staff of the State Department of Labor of its Unemployment Insurance Division was moved to 19 East Main Street, in a former department store called Ben's. Unemployment claims were processed here. After lunch on February 7, 1977, the petitioners and two other employees refused to return to work at Ben's. They reported instead to 13 East Main Street, most of them taking with them clerical documents to work on there. The processing of claims ceased at Ben's and a supervisory personnel instructed the claimants that no further applications would be taken that day. Thereafter, each employee was individually instructed by Frank Zagers, supervisor, on the application of the Taylor Law (Civil Service Law, art 14). Taylor Law sanctions were applied to all employees who refused to return to Ben's. Temporary employees were fired, employees working out-of-title were returned to title and permanent employees were fined. All of the petitioners continued to be employed despite the sanctions. The petitioners challenge the determination that they engaged in a prohibited strike. They contend that the record does not contain substantial evidence to support the determination that there was a strike within the meaning of subdivision 9 of section 201 of the Civil Service Law. The precipitating circumstances which brought about petitioners' refusal to continue working at Ben's after 1:00 P.M. on February 7, 1977, was the employees' objection to the substandard and dangerous conditions existent at Ben's. The employees filed a grievance with the employer on February 3, 1977, in which they indicated fear for their safety because of electrical deficiencies and limited exits. The hearing disclosed that the working conditions were substandard. The building was virtually unheated, requiring the workers to wear outside winter clothing, boots and gloves while at work. The high ceilinged room and the constant opening of the front door by claimants made heating of the premises with open heaters ineffective. The use of heaters caused employees concern because paper files were strewn about the building in close proximity to the heaters. Electrical cords connected the heaters to outlets which often caused fuses to blow. The cords strewn underfoot created an awkward and potentially dangerous condition. The floor was concrete, adding to the cold conditions and discomfort of the workers. The temperature was so extremely cold that the workers were being sent upstairs on a rotating basis to warm up. The boiler was not operating and was uncapped. One toilet, with a plugged up wash bowl, supplemented by a portable toilet brought in on February 7, 1977, was to accommodate all of the workers and claimants. On Monday, February 7, 1977, some 1,300 claimants were processed in the

morning. There were two exits in the building, one apparently blocked by a wind breakwall and one at the rear which was difficult to open. The building had been out of use for a long time and was dirty, dusty and generally in poor condition, with missing ceiling tiles and exposed electrical cords. On Friday, February 4, 1977, a meeting of employee representatives was held with Jerry Kamenker, the department's Manager for the Unemployment Division, and other supervisory staff about the work conditions and the concern of the employees for their safety and and that of the claimants they were processing. The department indicated that it was looking for another location. At the meeting's conclusion, CSEA representatives demanded that either other provisions be made for the workers or the safety of the building be verified by the issuance of a certificate of occupancy by the city no later than the next work day, which was Monday, February 7. The State's representatives indicated that their hands were tied, but that they would attempt to get the employees moved as soon as possible, and that by Monday they expected the certificate of occupancy to be issued based on conversations with Mr. Heim, agent for the owners of the building. Mr. Gorsky of the supervisory staff generally acknowledged the deplorable work conditions. The certificate was not issued on February 7, 1977, and, after several hours of delay to give the landlord an opportunity to produce it, city inspectors indicated that no certificate could be issued for the building. The CSEA representatives read the following statement to the employees before lunch. "You are to go to lunch. Our people are not returning to work at this building because there is no CO or certificate of occupancy and the building is unsafe and cold. Do not leave. Go upstairs where it is warm and safe. You are ready, willing and able to perform your duties in any other safe office. We are not coming back as per agreement reached Friday." The employees returned and reported upstairs, taking with them clerical work. Mr. Zagers informed the employees, after several calls to his supervisors, that they would be moved the next day to Hauppauge. He thereafter directed the employees to return to Ben's to process claimants. Upon their refusal, he again ordered them to do so. All but one again refused. Ben's was then closed and claimants were told to leave and return on Wednesday. Zagers then proceeded to interview each employee individually as to whether they would work at Ben's. They responded either that they were willing, ready able to work in a safe and healthy environment or simply "no comment". Zagers found them to be on strike and applied the sanctions. On appeal, the petitioners contend that the record does not contain substantial evidence to support respondent's determination that they engaged in a strike within the meaning of subdivision 9 of section 201 of the Civil Service Law. The argument is two pronged in that petitioners firstly allege that their actions were prompted out of a genuine and well-founded concern for their safety and, secondly, that, although they refused to continue to work in Ben's, they did whatever work possible at the premises to which they removed themselves. The first argument relates to the intent behind their action. A strike is defined by subdivision 9 of section 201 of the Civil Service Law as follows: "The term 'strike' means any strike or other concerted stoppage of work or slowdown by public employees". Webster's Third Unabridged Dictionary defines "strike" as a temporary stoppage of work by a body of workers designed to enforce compliance with demands (such as changes in wages, hours or working conditions) made on an employer. The language of the statute is absolute and would appear to encompass any work stoppage, irrespective of the motivation of the workers. Its predecessor statute, section 108 of the Civil Service Law (L 1958, ch 790, § 1) defined "strike" as "the

failure to report for duty, the *wilful* absence from one's position, the stoppage of work, or the abstinence in whole or in part from the full, faithful and proper performance of the duties of employment, for the purpose of inducing, influencing or coercing a change in the conditions or compensation, or the rights, privileges or obligations of employment." (Emphasis added.) In amending the law, the Legislature excised any reference to intent or motive. However, to be noted in conjunction with the statutory language is the history of the Taylor Law, which indicates that its purpose is directed at work stoppages that attempt to induce or coerce a change in the terms and conditions of employment (see Report of Governor's Committee on Public Employee Relations, p 61 [1966]). To conclude that every work stoppage is a strike appears to be at variance with not only the purpose of the Taylor Law, but also with general public policy of concern for the safety of workmen. Employees are entitled to protect themselves from threats to their safety and well being. The instant matter does not involve the classic case of a strike, which is usually generated by economic consideration. Recently, in a relevant case, The Second Department, in *Van Vlack v Ternullo* (74 AD2d 827), held that refusal to accept an out-of-title assignment because of a bona fide fear of personal injury cannot amount to a violation of the Taylor Law. A fair reading of the hearing transcript indicates that the employees had an actual belief that they were imperiled by their work conditions and that such belief was certainly reasonably founded when one considers the atrocious circumstances under which they labored. It is unreasonable to conclude that they acted out of other than reasonable fear for their safety. The evidence overwhelmingly supports this conclusion. The conditions at Ben's constituted a fire trap and were otherwise detrimental to their health. To be noted, as well, is the supervisory staff's concern for them and their own concurrence that the work place was inadequate. The determinations should be annulled.